**UNITED STATES of America**

v.

**Laura WHITEHORN, Defendant.**

**No. 86 Crim. 644 (WCC).**

United States District Court,
S.D. New York.

Jan. 21, 1987.

---

Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., New York City, for the U.S.; James L. Kainen, Asst. U.S. Atty., of counsel.

Holmes & Tipograph, New York City, for Laura Whitehorn; Susan V. Tipograph, of counsel.

WILLIAM C. CONNER, District Judge.

On December 8, 1986, defendant Laura Whitehorn pled guilty to Count One of a two-count indictment charging her with making a false statement in an application for passport, in violation of 18 U.S.C. § 1542. With the written consent of the Government, the plea was entered conditionally, pursuant to Rule 11(a)(2), Fed.R. Crim.P., reserving the right to appeal from this Court's denial of Whitehorn's motion to suppress certain evidence found in the search of her apartment in Baltimore, Maryland on May 11, 1985.

On December 2, 1986, at the conclusion of a two-day evidentiary hearing on the motion to suppress, the Court dictated from the bench a brief, informal oral opinion denying the motion and indicated that a formal written opinion would be entered after the parties had had the opportunity to file proposed findings of fact and conclusions of law. This Opinion incorporates the Court's formal findings and conclusions on the suppression issue, pursuant to Rule 12(e), Fed.R.Crim.P.

*Background*

For some time prior to May 1985, the Federal Bureau of Investigation ("FBI") had been seeking to obtain information as to the whereabouts of Marilyn Jean Buck, Linda Sue Evans and Dr. Alan Berkman, who were suspected members of a terrorist underground group which had been responsible, *inter alia,* for the 1981 armed robbery of a Brinks armored truck in Nyack, New York in which a Brinks guard and two Nyack policemen had been shot and killed. Buck had apparently shot herself during this robbery and walked with a pronounced limp. She was also wanted for escape, having failed to return following a furlough from a ten-year sentence she began serving in 1983 for violation of the Gun Control Act. Arrest warrants in connection with the Nyack robbery were also outstanding for Alan Berkman and Susan Lisa Rosenberg.

Prior investigation had led the FBI to conclude that Buck had resided for about a year prior to September 1984 at an apart-

ment in New Haven, Connecticut which had been rented under the name of "Ann Erickson," and that Rosenberg had also been an occupant or visitor in the apartment. On September 19, 1984, a U–Haul van was rented at 116 Whalley Avenue in New Haven under the name of "Eva Cannonier," and on the same day a van of similar description was used to move the possessions of the occupants from the New Haven apartment.

Two months later on November 30, 1984, Rosenberg and Timothy Blunk were arrested in Cherry Hill, New Jersey in another U–Haul van, also rented at 116 Whalley Avenue in New Haven, under the name of "William J. Hammond" by a man later identified as Blunk. At the time of the arrest, the van contained 740 pounds of dynamite, blasting caps, 14 weapons, ammunition and numerous false identification documents, including masters for the printing of such documents. Several of the masters bore the latent fingerprints of Linda Sue Evans. The van was being towed by a 1980 Oldsmobile sedan registered to "Louise Harmon" of Orange, Connecticut. This automobile had been serviced at an Exxon station at 284 Whalley Avenue in New Haven by a mechanic who identified a photograph of Marilyn Jean Buck as "Louise Harmon."

A portion of the dynamite in the van was traced to a shipment stolen from the Bland Construction Co. in Austin, Texas in 1980. Other dynamite bearing the same identification code was used in an explosive device found in December 1982 and attributed to the FALN, a terrorist group supporting Puerto Rican liberation.

Also found in the van was a manual for the reloading of ammunition which bore a latent fingerprint of Alan Berkman.

Among the weapons found in the van were a rifle and handgun which were purchased in Norco, Louisiana in February 1983, by a "Louise Robinett" who used a Louisiana driver's license for identification. The woman in the photograph of "Robinett" on a duplicate of this license was later identified as Linda Sue Evans. Sub-

sequent investigation disclosed that a woman identifying herself as "Christine Johnson" had worked at the Printing Plus Print Shop in North Haven, Connecticut from May 21, 1984 to November 30, 1984, suddenly leaving on the same day that Rosenberg and Blunk were arrested. A "Christine Johnson" was also employed at East Haven Print and Rubber Stamp Co. in East Haven, Connecticut for five months during the summer of 1984. The proprietors of both print shops identified the woman in a photograph of Linda Sue Evans as "Christine Johnson."

While employed at Printing Plus, "Christine Johnson" was provided with keys which permitted her to enter the shop and work alone there at night and on weekends. On December 3, 1984, a few days after Evans' abrupt departure, another employee found on the floor the negative of a Puerto Rican driver's license which was assumed to have been used to make false identification documents using the company's equipment.

It was also learned that Evans had resided at 135 Cherry Ann Street in Hamden, Connecticut, moving therefrom on September 19, 1984 in the same U–Haul van that had been used earlier that day to move Marilyn Jean Buck from her apartment in New Haven. The landlord and neighbors at the Cherry Ann apartments identified a photograph of Buck as a woman they had seen frequently at Evans' apartment, sometimes apparently wearing a blond wig.

On September 2, 1984, a supermarket in Cromwell, Connecticut was robbed by two armed white males posing as Drug Enforcement Agents with a search warrant which was left behind and later found to bear the latent fingerprints of Alan Berkman. A composite sketch of the other perpetrator is said to bear a strong resemblance to Timothy Blunk.

On October 16, 1984, a white female using the name of "Chris Johnson" and giving the address and telephone number of 135 Cherry Ann Street, Hamden, Connecticut, had left a guitar for repair at the Youngblood Music Workshop in Guilford,

Connecticut. "Johnson" telephoned the shop several times to inquire whether the guitar was ready and was finally told it would be ready about March 1, 1985. On May 7, 1985, "Johnson" again telephoned the shop and said she would be there to pick up the guitar on May 11, 1985. This call was traced to a pay telephone at 5432 Harford Road, Baltimore, Maryland.

Two days later, on May 9, 1985, FBI agents were watching this pay telephone when a woman whom they identified as Linda Sue Evans was seen making a call from the telephone and then entering the Graphic Expressions Print Shop at 5418–22 Harford Road. At about 7:15 P.M. the same day, the same woman returned to the pay telephone and made another call. Several minutes later a brown Toyota with New York license plates, driven by a white male, believed to be Alan Berkman, picked up the woman and drove her to the vicinity of the Yorkwood Apartments, a large residential complex at 1134 East Belvedere in Baltimore. After parking the vehicle, the driver also entered the apartment complex.

The next day, May 10, at approximately 10:00 A.M., two women identified as Linda Sue Evans and Marilyn Jean Buck left the apartment complex, entered the same brown Toyota and drove to Graphic Expressions, where Evans resigned her position. From the proprietor of Graphic Expressions, the FBI learned that Evans had worked there under the name of "Kate Thompson" and had given as her address the Dunhill Apartments on Belair Road, where she claimed to live with her sister who had two children, one with serious medical problems.

On the following day, May 11, 1985, Linda Sue Evans and Marilyn Jean Buck were arrested in New York City. Buck was carrying a New York driver's license in the name of Eva M. Mancuso, and a fully loaded .38 caliber revolver. Evans carried identification in the name of Joann Roth and a fully loaded 9 mm. semi-automatic pistol.

On the same day, when they were informed of the arrest of Evans and Buck, FBI agents in Baltimore decided to move quickly to locate the apartment in the Yorkwood complex where Evans, Buck and/or Berkman had apparently been staying and to obtain a warrant to search it.

At about 11:00 A.M. on May 11, 1985, the FBI learned from Otis Watts, the rental manager of the Yorkwood Apartments, that a woman identifying herself as "Ann Morrison" had rented Apartment D in Building 5714, The Alameda. She had moved in on February 1, 1985, accompanied by a woman whom she introduced as her sister, Natalie. Several neighbors identified photographs of Evans and Buck as two of the three women whom they had repeatedly seen entering or leaving Apartment D. An employee in the rental office, William Preston, indicated that the woman shown in the photograph of Buck had walked with a noticeable limp.

The FBI agents obtained from the rental office a passkey to Apartment D. At about noon on May 11, several agents went to the hallway outside of Apartment D, where they could see, through a narrow space between the threshold and the bottom of the door the feet of a person or persons moving within the apartment. Thereupon the agents went to their automobiles in the parking lot behind Building 5714 and got their shoulder weapons and bullet-proof vests. Returning to Apartment D, Agent H.T. Moore, accompanied by two other agents, knocked on the door. When a female voice inside asked "Who is there," Moore answered "It is the FBI; open the door please," and the female voice responded "No." Moore then announced, "We have a warrant for the arrest of Dr. Berkman; open the door," to which the voice again responded "No."

The agents then heard one or more persons moving about the apartment and the sound of paper being torn. Fearing that evidence was being destroyed, they decided to enter without a warrant, even though they knew that a search warrant was going to be applied for later that day. Moore first tried the passkey and found that it did not work. Then he called out that if the door was not opened, it would be forced

open. When there was no response to this announcement, the door was kicked in.

Inside, the agents found the defendant Laura Whitehorn standing in the entry, and she was placed under arrest on a charge of harboring Marilyn Buck. After Whitehorn was handcuffed, a three- or four-minute security check of the apartment was made, but no other persons were present and nothing else of interest was noted. After completing the security check, the agents secured the apartment and left for the FBI office about 12:10 or 12:15 P.M., leaving behind Agent Garrett to guard the apartment. As Whitehorn was being transported to the FBI office, she assaulted one of the agents in an attempt to escape from custody.

All of the foregoing facts, together with considerable additional detail, were set forth in the affidavit in support of the application for a search warrant.

During the trip back to the FBI office, Agent Moore reported by radio to the command center which had been set up in the office, that Apartment D had been forcibly entered and an unidentified white female had been arrested. Moore expressed the belief that the interval between the time when the FBI agents announced their presence at the door and the time of the forced entry was sufficient to allow the rigging of an explosive device and, considering the group's history of using such devices, it would be prudent to make a bomb sweep of the apartment to reduce the hazard to neighbors in the building and to the FBI agents who would be entering the apartment to execute the search warrant. He accordingly requested that a bomb expert be sent to make such a sweep even before the warrant was obtained.

Approximately 45 minutes later, Agent Ken Moore (no relation to H.T. Moore), the FBI's local bomb expert, arrived and, accompanied by Agent Garrett, entered the apartment to make a bomb sweep which took about an hour and 45 minutes. During this sweep, Moore went through the entire apartment, opening every container and envelope large enough to enclose an explosive device, including everything larger than a business-size envelope. In the course of this sweep, the agents saw a Uzi submachine gun and a number of timing mechanisms of the type used in constructing explosive devices, as well as photographic and laminating equipment of the type used in producing drivers' licenses, and a quantity of blank social security cards. However, they found no complete bombs nor any explosive materials.

The apartment was again secured, and Agent Ken Moore then went to the basement storage bin assigned to Apartment D, broke the padlock which secured it and searched the contents. In it he found no explosive devices or materials, but miscellaneous items including military uniforms, wigs and the like.

Upon completion of the bomb sweep, Agent Garrett contacted the command center and gave an account of the findings to the agents who were working there on the preparation of the affidavit to be used in the application for a search warrant. However, the only information discovered in the sweep which was specifically incorporated in the affidavit was the presence of the Uzi submachine gun, although the affidavit did state that "it is the belief of your affiant that probable cause exists that certain materials, namely false identities of remaining fugitives * * * may be found in Apartment D * * *," a belief which may have been based on the finding of the photographic and laminating equipment and the blank Social Security cards.

Despite the failure to discover any explosive materials in the apartment or the basement storage bin, the affidavit represented that "It is also the belief of your affiant that there is also hidden in the apartment or storage area located in the basement of said apartment building stolen explosive materials * * *."

The affidavit was signed by Agent David Major at about 6 P.M. on May 11 and the warrant was signed immediately thereafter by Magistrate Rosenberg, who had been present in the command center all afternoon (it being a Saturday), and had heard

the transmissions reporting on the findings of the bomb sweep.

Shortly after the warrant was signed, the apartment was entered again and a thorough search, lasting about two days, was conducted.

*Concessions and remaining issues*

In order to present to the Court a clear-cut issue as to whether the evidence uncovered in the search pursuant to the warrant should be suppressed, the Government has conceded:

(1) that the initial forcible entry into Apartment D was without a warrant or probable cause;

(2) that the subsequent bomb sweep was likewise without a warrant or probable cause;

(3) that several significant items of evidence which were found in the search pursuant to the warrant and which the Government proposed to offer at the trial had already been discovered in the bomb sweep;

(4) that the affidavit in support of the application for search warrant referred to several items which were found in or suggested by the bomb sweep;

(5) that Magistrate Rosenberg was present during the preparation of the affidavit and heard the radio reports on the findings of the bomb sweep;

(6) that the affidavit incorrectly stated the name of the rental manager of the Yorkwood Apartments as "Otis Watson" rather than Otis Watts;

(7) that the affidavit incorrectly stated that it was "Otis Watson" rather than William Preston who reported that the woman identified as Marilyn Jean Buck walked with a limp; and

(8) that the affidavit incorrectly suggested that the apartment or the basement storage bin might contain explosives, although at the time of execution of the affidavit, both had already been forcibly entered and searched and no explosives had been found.

At the hearing, Whitehorn conceded that all of the evidence in question would have been, and in fact was, discovered in the search pursuant to the warrant.

Thus the only issues remaining for resolution by the Court are:

(1) whether the search warrant was invalid (a) because it was not signed by a detached and neutral magistrate; (b) because of the aforementioned factual errors in the affidavit; or (c) because the affidavit recited information which had been discovered through an illegal search; and

(2) whether all of the evidence discovered in the security check and/or the bomb sweep should be suppressed even though it would concededly have been discovered in the search pursuant to the warrant.

## Discussion
### Validity of the warrant

Defendant's attacks on the warrant deserve only brief treatment.

■ Although it was an unusual practice for the magistrate to be present in the FBI office during the preparation of the affidavit which was to be presented to him, and while radio transmissions reporting on the findings of an illegal search were coming in, creating at least the superficial appearance of excessive magisterial involvement in the prosecutorial process, the Court concludes that this does not vitiate the warrant.

The magistrate was apparently present only because the warrant was being sought on a Saturday in exigent circumstances. When the magistrate, perhaps at a sacrifice of his weekend leisure activity, cooperated by coming to the office, it surely was not anticipated that he would be kept waiting five hours while the affidavit was prepared. There has been no showing that his presence in the office destroyed his objectivity or influenced his decision to issue the warrant. The affidavit made an overwhelming case of probable cause for the issuance of the warrant. It is virtually inconceivable that a perfectly detached and neutral magistrate to whom the affidavit

was presented, even without the reference to the Uzi submachine gun and the expectation of finding explosive materials or false identification documents, would have failed to sign the warrant. From the other facts presented in the affidavit, any reasonable person would conclude that there was a high probability that Apartment D was being used as a "safe house" to harbor one or more fugitives who were wanted for serious crimes and that a search of the apartment might uncover evidence of their whereabouts and those of other members of their underground group, and possibly a cache of weapons, explosives and other contraband.

■ The only significant factual error in the affidavit was the stated belief that explosives might be found in the apartment or the basement storage bin, both of which had already been swept for explosives with negative results. However, this error was not critical to the issuance of the warrant. Even without this statement, the affidavit was clearly sufficient, by a wide margin, to establish probable cause.

The other factual errors in the affidavit are too trivial to have conceivably affected the decision to issue the warrant. The magistrate surely attached no importance to the fact that the rental manager's name was given as "Watson" rather than Watts or that the person who stated that one of the women frequenting Apartment D walked with a limp was not "Watts" but another man in the rental office.

There is no evidence that any of the aforementioned errors in the affidavit was the product of an intent to deceive the magistrate, and no logical reason to suspect such a motive. The errors clearly appear to be the result of mere negligence, and not "of deliberate falsehood or of reckless disregard for the truth" as required to invalidate the warrant under the standard established by *Franks v. Delaware*, 438 U.S. 154, 171–172, 98 S.Ct. 2674, 2684 57 L.Ed.2d 667 (1978).

The Court concludes that the warrant was duly and legally issued and conferred authority for the comprehensive search of the apartment which was conducted commencing during the evening of May 11, 1985. There remains, of course, the question whether the evidence uncovered in that search must be suppressed because it was tainted by the illegal entry and search which preceded the issuance of the warrant.

*The inevitable discovery doctrine*

Defendant Whitehorn contends that this case is controlled by the decision of the Court of Appeals for the Second Circuit in *United States v. Segura*, 663 F.2d 411 (2d Cir.1981). In that case, agents arrested the defendant Segura as he entered his apartment building, forcibly took him to the door of his apartment, knocked on the door and, when a woman inside came to the door, entered without requesting or receiving permission and conducted a security check in which they found drug paraphernalia in plain view. It was not until evening of the following day, some 19 hours later, that a warrant was signed. In the meantime, two agents remained in the apartment to secure it. An hour after the warrant was issued, the agents commenced a thorough search which disclosed additional evidence. The Court ruled that the items of evidence which were seen during the security check must be suppressed because the illegal occupation of the apartment by the agents during the 19–hour period prior to issuance of the warrant constituted an effective "seizure" of that evidence. However the Court reversed the order of the district court granting the motion to suppress insofar as it concerned the items of evidence discovered for the first time in the search pursuant to the warrant, rejecting the lower court's reasoning that if it had not been for the illegal "seizure" the evidence later found might have been removed or destroyed before the post-warrant search.

On certiorari review, the Supreme Court affirmed the ruling that the evidence discovered after the warrant was obtained should not be suppressed because it was not "fruit of the poisonous tree" but was derived from an "independent source."

Since the illegal police conduct was not a "but for" cause of the discovery and seizure of the evidence, the connection between them was "so attenuated as to dissipate the taint." *Segura v. United States,* 468 U.S. 796, 804–816, 104 S.Ct. 3380, 3385–3392, 82 L.Ed.2d 599 (1984). The Government did not appeal from the suppression of the items found in the warrantless security check.

 The "independent source" doctrine recognized by the Supreme Court in *Segura* preserves the admissibility of the evidence first discovered in the post-warrant search in the present case. However, the Court of Appeals' ruling in *Segura* would require suppression of the items of evidence seen in the warrantless bomb sweep were it not for the doctrine of "inevitable discovery" established by the later Supreme Court decision in *Nix v. Williams,* 467 U.S. 431, 443–444, 104 S.Ct. 2501, 2503, 81 L.Ed.2d 377 (1984).

In *Nix* a man suspected in connection with the disappearance of a 10–year-old girl was being transported by police officers to the city where the girl disappeared. Despite the fact that the suspect had indicated that he did not wish to be questioned in the absence of his attorney, one of the officers remarked during the trip that there had been predictions of a snow storm which might cover the girl's body so that "you yourself may be unable to find it * * * and since we will be going right past the area * * * I feel we should stop and locate the body, that the parents * * * should be entitled to a Christian burial for this little girl who was snatched away from them on Christmas Eve and murdered." Shortly thereafter, the suspect directed the officers to the girl's body.

In its first review in the case, the Supreme Court reversed the defendant's conviction, ruling that evidence of the defendant's knowledge of the location of the body should have been suppressed because it was the product of a violation of his right to counsel, but indicated that evidence of the body's location and condition might nevertheless be admissible on the theory that it would have been discovered in any event. On its review of the defendant's conviction following a retrial, the Supreme Court ruled this evidence admissible. After tracing the development of the exclusionary rule and its objective of deterring police misconduct, the Court analyzed the "independent source" doctrine and its purpose of putting the police in no worse position than if they had not been guilty of misconduct. While the Court recognized that the "independent source" doctrine was inapplicable in *Nix* because there the police obviously had learned of the location of the body through violation of the suspect's constitutional rights, it observed that the underlying policy of putting the police in no worse position than if there had been no such violation required the establishment of a cognate doctrine of inevitable discovery:

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means—here the volunteers' search—then the deterrence rationale has so little basis that the evidence should be received in evidence. Anything less would reject logic, experience and common sense.

467 U.S. at 444, 104 S.Ct. at 2503.

The "inevitable discovery" exception to the exclusionary rule has since been repeatedly applied in the fourth amendment context. *United States v. Silvestri,* 787 F.2d 736 (1st Cir.1986); *United States v. Merriweather,* 777 F.2d 503 (9th Cir.1985), *cert. denied, Merriweather v. United States,* — U.S. ——, 106 S.Ct. 1497, 89 L.Ed.2d 898 (1986); *United States v. Cherry,* 759 F.2d 1196 (5th Cir.1985).

Here the Court finds by a preponderance of the evidence that the discovery of all of the items found in the post warrant search was indeed inevitable. FBI agents were already working on the preparation of an affidavit to be used in the application for a warrant. The facts they already knew before their first entry into the apartment were clearly enough to constitute probable

cause for the issuance of the warrant. And the search pursuant to the warrant concededly would have, and in fact did, result in the discovery of all the evidence in question.

Suppressing any of the evidence found in the apartment would obviously put the law enforcement officers in a much worse position than if defendant's rights had not been violated by the warrantless entry and search.

The inevitable discovery exception to the exclusionary rule is clearly applicable here and the motion to suppress is accordingly denied.

SO ORDERED.