UNITED STATES of America, Appellee,

v.

Laura WHITEHORN,
Defendant-Appellant.

No. 1320, Docket 87–1122.

United States Court of Appeals,
Second Circuit.

Argued June 26, 1987.

Decided Sept. 29, 1987.

Kerri L. Martin, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., James L. Kainen, Asst. U.S. Atty., New York City, of counsel), for appellee.

Susan V. Tipograph, New York City (Holmes & Tipograph, New York City, of counsel), for defendant-appellant.

Before LUMBARD, CARDAMONE, and PIERCE, Circuit Judges.

LUMBARD, Circuit Judge:

On December 8, 1986, Laura Whitehorn pled guilty in the Southern District of New York to a two-count indictment which charged her with making false statements in an application for a passport in the name of "Sharon L. Scott" and with submitting a Vermont driver's license in the same name in support of this application in violation of 18 U.S.C. §§ 1542 and 1001. Agents of the Federal Bureau of Investigation seized the false passport and driver's license during a two-day warranted search of her Baltimore, Maryland apartment following her May 11, 1985 arrest. However, Whitehorn claims and the government concedes that this evidence was discovered prior to the issuance of the warrant while agents were conducting a lengthy "bomb sweep" of the apartment. Consequently, before entering her plea, Whitehorn moved on various fourth amendment grounds to suppress the passport, driver's license and certain other evidence obtained as a result of the search.

On January 21, 1987, in a thorough and persuasive opinion, Judge Conner denied Whitehorn's motion. 652 F.Supp. 395. Whitehorn entered her plea conditionally, having reserved her right to appeal the denial of her suppression motion. She was subsequently sentenced to a two-year term of imprisonment. Whitehorn now contends that Judge Conner erred in applying the "inevitable discovery" exception to the exclusionary rule, *see Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), and in holding that the magistrate who had signed the search warrant remained neutral and detached despite his presence in F.B.I. headquarters during the preparation of a supporting affidavit. We affirm.

I.

Whitehorn's arrest stemmed from efforts by the F.B.I. to apprehend several fugitive members of a violent underground group suspected of murdering an armored car guard in Nanuet, New York and two police officers in Nyack, New York in 1981. The incident, which is described in *United States v. Buck*, 813 F.2d 588 (2d Cir.1987), occurred on October 20, 1981 when a group of men emerged from a van in a shopping mall parking lot firing an M–16 machine gun at guards unloading a Brinks armored car. One guard was killed, the other seriously injured. The gunmen escaped with $1.6 million dollars. Later, when stopped by New York state police, the gunmen burst from the back of a U–Haul truck firing automatic weapons, killing two officers and wounding the third. *See Buck*, 813 F.2d at 589. During 1984 and in the months leading up to the May 1985 search of Whitehorn's apartment, the F.B.I.'s investigation of the incident focused on the whereabouts of four members of the terrorist group—Marilyn Jean Buck, Susan Lisa Rosenberg, Linda Sue Evans, and Dr. Alan Berkman.[1]

---

**1.** The information herein may be found in the 12–page, 38–paragraph affidavit in support of

On November 29, 1984, Rosenberg and a confederate were arrested in Cherry Hill, New Jersey while towing a U–Haul trailer, rented under a fictitious name. The trailer contained 740 pounds of dynamite, blasting caps, 14 weapons, ammunition, numerous pieces of false identification and several masters used for printing such documents. Some of these masters bore Evans' fingerprints and several of the weapons were traced to her under a fictitious name. The automobile pulling the van was traced to Buck, who had registered the car also using an alias. Berkman's latent fingerprints were found on an ammunition manual in the U–Haul. On the day of Rosenberg's arrest, Evans suddenly quit her job in a New Haven printing shop and moved from that city.

Through subsequent investigation, the F.B.I. concluded that Evans, Buck and other members of the group had moved operations to the Baltimore, Maryland area. Evans, using the name "Chris Johnson," made several phone calls to the Youngblood Music Workshop in Guilford, Connecticut one of which was traced to a pay telephone at 5432 Hartford Road in Baltimore. While monitoring that phone on May 9, 1985, agents observed Evans make two more calls. Several minutes after placing the second call, Evans got into a brown Toyota with New York license plates, driven by a man believed to be Berkman. Evans and the man drove to the vicinity of the Yorkwood Apartments, a large residential complex in Baltimore, which they separately entered.

The next morning, on May 10, F.B.I. agents saw Evans and a woman, later identified as Buck, leave the apartment complex and drive away in the brown Toyota which headed for New York. At approximately 10:00 a.m. the next day, Buck and Evans, who had been under surveillance since they left Baltimore, were arrested in New York City. At the time of their arrests, both women were carrying fully-loaded weapons and false identification.

On the day of the arrests, May 11, F.B.I. agents in Baltimore quickly moved to locate the specific apartment in the Yorkwood complex in which they believed Evans and Buck had been staying with Berkman, and to obtain a warrant to search it. Additionally, several F.B.I. agents from the New York office traveled to Baltimore to draft a supporting affidavit detailing the F.B.I.'s investigation of the fugitives and to provide other background information for the warrant.

At approximately 11:00 a.m. that same morning, agent Tom Moore arrived at the Yorkwood Apartments. The rental manager of the complex told him that a woman named "Ann Morrison" had rented apartment D in Building 5714 and had been living there with her sister, "Natalie." Another employee in the rental office identified one of these women as Buck and accurately described her as walking with a limp.

Moore then went to Building 5714, where he was joined by agents Michael Garrett and Roger Kuhlman. While Garrett positioned himself on the staircase below apartment D, Moore and Kuhlman interviewed the tenants of two nearby apartments. Both identified Buck and Evans from photographs as two of the three women whom they had repeatedly seen entering and leaving apartment D. At some point during these interviews, agent Garrett announced that he had seen feet moving within the apartment through the narrow space underneath its door. After retrieving weapons and donning bulletproof vests, the agents returned to apartment D, knocked on the door, identified themselves as F.B.I. agents and announced that they had a warrant for Dr. Berkman's arrest. A woman inside refused them entry. The agents said they then heard the sound of paper being torn within the apartment. Fearing that evidence was being destroyed, agent Moore attempted to open the door with a passkey he had been given at the rental office. When he found that the key would

---

the application for a warrant to search Whitehorn's apartment prepared by F.B.I. Special Agent Major on the day of Whitehorn's arrest, or in *United States v. Whitehorn,* 652 F.Supp. 395 (S.D.N.Y.1987).

not work, he told the woman inside that if she did not open the door, it would be forced open. When no response was forthcoming, the agents kicked the door open and found Whitehorn inside. They immediately placed her under arrest on the charge of harboring Buck and then conducted a three-to-four minute security check of the apartment during which they discovered no one else and nothing of evidentiary value.

Leaving agent Garrett to guard the apartment, agents Moore and Kuhlman left to take Whitehorn to the F.B.I. office shortly after noon. By that time, agents Foley, Ash, and Williams had arrived at the office and were beginning to draft the search warrant affidavit with agent David Major. On the trip back, agent Moore radioed the group and reported that apartment D had been forcibly entered and that Whitehorn, who was as yet unidentified, had been arrested. During the conversation Moore expressed concern that because of the terrorist group's history of using explosives, there was a possibility that Whitehorn had triggered an explosive device between the time that the agents had first announced their presence and when they forced their entry into the apartment. He therefore requested a "bomb sweep" of the apartment to protect Whitehorn's neighbors and the F.B.I. agents who would be arriving to execute the expected search warrant.

Approximately 45 minutes later, agent Kenneth Moore, the F.B.I.'s local bomb expert, arrived at apartment D. The F.B.I. did not inform Whitehorn's neighbors about the possibility of an imminent explosion, nor did agents take the usual precautions of securing the assistance of the relevant utility companies, the fire department or medical personnel in dealing with the emergency. Instead, for the next hour and 45 minutes, the bomb expert and Garrett proceeded to look through every container and envelope in the apartment large enough to contain an explosive device. They performed a similar search of a basement storage bin assigned to the apartment. In the course of the bomb sweep, the agents discovered an Uzi submachine gun; a number of timing mechanisms commonly used in outfitting bombs; photographic and laminating equipment of the type used in making drivers' licenses; and a number of blank social security cards. They found no explosive paraphernalia in the storage area.

The agents left these items in the apartment. However, upon completing the sweep, agent Garrett radioed the command center and reported what they had seen. The subsequent affidavit included reference to the agents' sighting of a Uzi submachine gun. Despite the fact that the bomb sweep failed to uncover any explosive materials, the affidavit also stated the "affiant's belief" that stolen explosive materials remained hidden in the apartment and its basement storage bin.

At about 6:00 p.m. that day, over five hours after their initial entry into Whitehorn's apartment, the agents completed the affidavit in support of the search warrant and immediately presented it to Magistrate Rosenberg, who had come to F.B.I. headquarters. He had spent the afternoon hours that day, a Saturday, there with the agents who were preparing the affidavit and had heard agent Garrett's radio transmissions concerning the bomb sweep. At about 7:15 p.m., the magistrate issued a warrant authorizing the agents to search apartment D, for all evidence of, *inter alia*, "false identities of federal fugitives," their telephone numbers and addresses, location of other safe houses and evidence of harboring of specific fugitives, including Berkman, Buck and Evans. The F.B.I. then conducted a full-scale two-day search of Whitehorn's apartment, during which they uncovered, among other things, a passport bearing Whitehorn's picture and the name "Sharon L. Scott" and a Vermont driver's license in that name. The government subsequently traced the passport to a false passport application which Whitehorn made in the Southern District of New York.

On October 15, 1986, Whitehorn moved to suppress the evidence found in her apartment and the subsequently discovered passport application. Whitehorn claimed that the "Sharon Scott" identifications

were first found during the bomb sweep, an illegal search, requiring their suppression under *United States v. Segura*, 663 F.2d 411 (2d Cir.1981), *aff'd*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). She also argued that the search warrant was invalid under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), because the supporting affidavit contained false statements which the agents made with knowing or reckless disregard of the truth, or, alternatively, because the magistrate had abandoned his neutral and detached role by being at F.B.I. headquarters while the affidavit was being prepared and hearing radio transmissions about the bomb sweep.

The government conceded the illegality of the bomb sweep, and on November 25, 1986, Judge Conner ordered an evidentiary hearing to determine when the incriminating evidence was discovered in relation to the sweep and to determine the circumstances surrounding the issuance of the warrant.

During the hearing on December 1 and 4, 1986, Judge Conner heard testimony from four of the F.B.I. agents involved in the sweep and search of Whitehorn's apartment.[2] The government contended that the suppression motion should be denied because all of the evidence recovered from the apartment would inevitably have been discovered pursuant to a valid search and therefore was admissible under *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). In order to frame the inevitable discovery issue the government conceded, *inter alia*, the following:

(1) Several significant pieces of evidence the government intended to introduce at trial, most prominently the "Sharon Scott" passport and license, had first been discovered during the bomb sweep;

(2) The search warrant affidavit referred to several items which were found in or suggested by the bomb sweep;

(3) Magistrate Rosenberg was present during the preparation of the affidavit and heard radio reports on the findings of the bomb sweep; and

(4) The affidavit contained certain factual errors and suggested that explosive materials would be found in the apartment and its basement storage bin, despite the fact the bomb sweep had yielded no explosives.

Whitehorn conceded that all of the challenged evidence would have been discovered in the subsequent warranted search.

In denying Whitehorn's motion, Judge Conner first rejected her attack on the validity of the search warrant. He held that the magistrate's presence in F.B.I. offices, while creating "at least the superficial appearance of excessive magisterial involvement," *Whitehorn*, 652 F.Supp. at 400, did not vitiate the warrant because the magistrate was there only because the warrant was being sought on a Saturday under exigent circumstances and no one anticipated that he would have to wait five hours for the affidavit to be completed. More important, Judge Conner found that the affidavit presented "an overwhelming case for probable cause":

It is virtually inconceivable that a perfectly detached and neutral magistrate to whom the affidavit was presented, even without the reference to the Uzi submachine gun and the expectation of finding explosive materials or false identification documents, would have failed to sign the warrant. From the other facts presented in the affidavit, any reasonable person would conclude that there was a high probability that Apartment D was being used as a "safe house" to harbor one or more fugitives who were wanted for serious crimes and that a search of the

---

**2.** Pursuant to the parties' stipulation, Judge Conner also considered the transcripts of three similar suppression hearings concerning the F.B.I.'s search of Whitehorn's apartment. The hearings arose in connection with a separate prosecution of Whitehorn in the Eastern District of Maryland on charges relating to her alleged posses-sion of weapons and false identification documents, *see United States v. Whitehorn*, 813 F.2d 646 (4th Cir.1987), and two prosecutions of Evans. *See United States v. Evans*, 810 F.2d 1161 (2d Cir.1986); *United States v. Evans*, 629 F.Supp. 1544 (D.Conn.1986).

apartment might uncover evidence of their whereabouts and those of other members of their underground group, and possibly a cache of weapons, explosives and other contraband.

*Id.* at 400–01. Accordingly, he concluded that neither the magistrate's awareness of the bomb sweep findings nor the errors in the affidavit were of moment. Finding nothing to suggest that any of these errors were the product of an intent to deceive the magistrate, he also rejected Whitehorn's argument under *Franks v. Delaware, supra.*

Finally, Judge Conner agreed with the government that the requirements of the "inevitable discovery" exception to the exclusionary rule, set forth in *Nix v. Williams*, had been met. He found that the government had proven by a preponderance of the evidence that the items found in the bomb sweep would inevitably have been discovered in the warranted search, noting that F.B.I. agents were already working on the application for the search warrant at the time the sweep was conducted, and that "[t]he facts they already knew before their first entry into the apartment were clearly enough to constitute probable cause for the issuance of the warrant." *Whitehorn*, 652 F.Supp. at 402–03.

## II.

In holding that evidence first detected by the bomb sweep of Whitehorn's apartment was admissible, Judge Conner stated that our ruling in *United States v. Segura*, 663 F.2d 411 (2d Cir.1981), *aff'd*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), would require its suppression were it not for the "inevitable discovery" exception to the exclusionary rule endorsed by the Supreme Court in *Nix v. Williams*, 467 U.S. at 441, 104 S.Ct. at 2507. We agree.

In *Segura*, we affirmed that portion of an order suppressing evidence of drug paraphernalia detected during a security check conducted immediately after an illegal entry into defendant's apartment, while reversing that portion which suppressed evidence first discovered in the apartment 19

hours later pursuant to a validly issued warrant. Finding that the "independent source" doctrine applied, the Supreme Court agreed that post-warrant evidence should not have been suppressed. 468 U.S. at 813–16, 104 S.Ct. at 3389–91. The Court pointed out that our affirmance of the suppression of pre-warrant evidence was not before it. *Id.* at 802 n. 4, 804, 104 S.Ct. at 3384 n. 4, 3385.

About a month before it decided *Segura*, but subsequent to our decision in that case, the Supreme Court announced its decision in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). There, the Court held that evidence concerning the location and condition of the body of a ten-year-old girl whom the defendant had murdered could be introduced at his retrial, even though the police were led to the body through admissions elicited during custodial interrogation found unconstitutional in an earlier appeal. *See Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). The Court observed that the body would have been discovered without the defendant's admissions because a search had been in progress at the time and search-team members were close to the location of the body.

This exception to the exclusionary rule allows evidence initially detected as the result of unlawful government conduct to be introduced nonetheless "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix*, 467 U.S. at 444, 104 S.Ct. at 2509. This exception, the Court made clear, was not a revolutionary concept but rather the logical extension of another, the independent source doctrine. Both exceptions were necessary to ensure that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred." *Id.* at 443, 104 S.Ct. at 2509 (emphasis in the original; footnote omit-

ted). Finally, the *Nix* Court rejected the assertion that this equilibrium somehow changed, and required suppression, when the police acted in bad faith in illegally detecting the challenged evidence. So long as it is clear that such evidence would inevitably have been discovered by lawful means, suppression is inappropriate. *Id.* at 445, 104 S.Ct. at 2509.

In light of the rationale for this doctrine, we disavow that portion of our decision in *Segura* that supports the proposition that evidence illegally discovered prior to a warranted search must necessarily be suppressed. Accordingly, we agree with the district court that *Segura* does not mandate suppression in this case.

■ We further agree with Judge Conner that the requirement of the exception—that the challenged evidence would inevitably have been discovered by lawful means—was met. Agents at the F.B.I. office actually began the warrant application process over an hour before the illegal bomb sweep of Whitehorn's apartment occurred. They had already pinpointed the apartment to be searched. Through interviews with neighbors as well as prior extensive investigation, they knew that two of the apartment's occupants, Evans and Buck, had a history of trafficking in false identification documents, weapons, and explosives; indeed, the night before Evans and Buck had been arrested carrying all but the latter. In short, the agents had overwhelming probable cause before the bomb sweep to search the apartment in the belief that it was being used, in Judge Conner's words, as a "safe house" for federal fugitives in which false identification documents and other types of information detected by the bomb sweep reasonably

could be expected to be found. Under these circumstances, and given that the agents were then proceeding to secure a warrant which specifically authorized the seizure of the challenged evidence, we conclude that the district court properly denied Whitehorn's motion to suppress the evidence first detected by the bomb sweep.[3]

Nor are we persuaded otherwise by either of Whitehorn's arguments against applying the inevitable discovery exception. Whitehorn first contends that the bomb sweep evidence cannot be deemed to have been inevitably discovered by legal means because the affidavit in support of the subsequent search was "tainted" by its reference to or inclusion of information obtained from the sweep. Presentation of this tainted affidavit to the magistrate, the argument runs, makes speculative the assumption of inevitable discovery of the evidence through lawful means. As pointed out in *United States v. Levasseur,* a case involving substantially the same problem, "[i]t is well settled that '[t]he ultimate inquiry ... is not whether the underlying affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause.'" 620 F.Supp. 624, 631 n. 2 (E.D.N.Y.1985) (*quoting United States v. Lace,* 669 F.2d 46, 49 (2d Cir.1982)), *aff'd on other grounds,* 816 F.2d 37 (2d Cir.1987).[4] Where a court can conclude from the search warrant affidavit that probable cause for the search existed, without reference to the tainted information, the search remains valid. *See, e.g., Lace, supra,* 669 F.2d at 48–49.

Judge Conner specifically found that the affidavit supported probable cause for a

---

**3.** We note that the Fourth Circuit recently arrived at the same conclusion in reviewing the constitutionality of this search in another prosecution of Whitehorn for assault, possession of false identification documents and possession of an Uzi submachine gun and silencer. *United States v. Whitehorn,* 813 F.2d 646 (4th Cir.1987).

**4.** In *United States v. Levasseur, supra,* Judge Glasser held that the inevitable discovery doctrine justified admission of the contents of footlockers which F.B.I. agents had opened soon after a warrantless entry into defendants' house.

The defendants, like Whitehorn's alleged confederates, had a history of using explosives in general and had bombed several public buildings. The agents suspected that the footlockers might have been booby-trapped with explosives. As a result, a bomb technician opened and inspected the lockers for such material. When he found guns and boxes of ammunition inside, he radioed this information to other F.B.I. agents who were then preparing a search warrant application at headquarters.

detailed search of the apartment "even without the reference to the Uzi submachine gun and the expectation of finding explosive materials or false identification documents", *Whitehorn*, 652 F.Supp. at 401,—a finding which Whitehorn does not contest on appeal. Consequently, that information from the bomb sweep found its way into the search warrant application does not invalidate the subsequent warranted search of Whitehorn's apartment or render the discovery of the challenged evidence any less inevitable.

Whitehorn's other argument against applying the inevitable discovery exception is equally unavailing. Because the Supreme Court in *Nix* sanctioned the admission of the victim's body and its location but refused earlier in *Brewer* to allow the admission of defendant's statements about the body, *Brewer v. Williams*, 430 U.S. at 404–06, 407 n. 12, 97 S.Ct. at 1242–43 n. 12 (1977), Whitehorn contends that the exception is limited to the indirect products of an illegal search. Accordingly, she argues that like the statements excluded in *Brewer*, the direct evidence of the bomb sweep (*i.e.*, the items actually seen during the sweep, including the "Sharon Scott" driver's license and passport) should be suppressed. We recently rejected a similar attempt to engraft a direct-indirect products distinction onto the inevitable discovery doctrine in *United States v. Pimentel*, 810 F.2d 366 (2d Cir.1987). As we observed there, nothing in *Nix* supports an indirect products limitation. Furthermore, cases applying the doctrine both before and after *Nix* have implicitly rejected such a limitation. *Id.* at 368–69.

■ Whitehorn's final argument is that the district court erred in finding that the magistrate had not abandoned his "neutral and detached" role in issuing the warrant. Whitehorn points out that the magistrate was in the F.B.I. office for over six hours before signing the warrant and that during that time he concededly heard the radio transmissions reporting the findings of the bomb sweep. Whitehorn maintains that the magistrate, by thereafter signing the warrant, vicariously and knowingly partici-

pated in an illegal search and knowingly countenanced deliberate falsehoods in the affidavit used to secure the warrant, *i.e.*, the false assertion that the Uzi submachine gun was found in plain view and the misleading assertion that explosives were expected to be found within the apartment. Whitehorn contends that such behavior constituted an abdication of the magisterial role of the sort requiring suppression under *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979). We disagree.

While the magistrate must certainly have been aware of the bomb sweep, there is nothing to suggest that he focused exclusively on the several errors contained in the 38–paragraph affidavit presented him. As Judge Conner found, even if he had been aware of the errors, the affidavit without the challenged information presented overwhelming probable cause. Magistrate Rosenberg did not assist in the drafting of the warrant or in any aspect of the F.B.I.'s investigation. Nor is there anything that suggests that he was in F.B.I. headquarters for any reason other than to facilitate the issuance of the warrant on a Saturday.

Whitehorn's argument reduces to the proposition that the magistrate abandoned his role simply because he was in the F.B.I. office where the agents were preparing the warrant application and because he signed the warrant after learning that a search of dubious constitutionality had taken place. Such conduct hardly rises to the level of the excessive magisterial zeal found unacceptable by the Supreme Court in *Lo-Ji*. There, the Court found that a town judge who had signed a warrant authorizing a search of an adult bookstore for obscene films and books had become an "adjunct law enforcement officer" by accompanying police to the store and participating in, if not orchestrating, the search. Once at the store, the town judge determined whether a given item was obscene and then instructed the police officers to seize all similar items as well, "leaving determination of what was 'similar' to the officer's discretion." *Lo-Ji*, 442 U.S. at 327, 99 S.Ct. at 2325. The Court specifically contrasted

this town judge with a magistrate who leaves his regular office "in order to make himself readily available to law enforcement officers who may wish to seek the issuance of warrants by him"; the latter, the Court made clear, does not thereby lose his "neutral and detached" character. *Id.* at 328 n. 6, 99 S.Ct. at 2325 n. 6.

In short, Magistrate Rosenberg did little more than save valuable time by waiting in F.B.I. headquarters until the F.B.I.'s search warrant application was ready. We cannot equate his passive receipt of the bomb sweep information with impermissible participation in that search or any other aspect of the investigation.

Affirmed.