888 F.2d 234
 UNITED STATES of America, Appellee,
v.
Mutulu SHAKUR, a/k/a "Doc", a/k/a "Jerel Wayne Williams",
and Marilyn Jean Buck, a/k/a "Carol Durant", a/k/a
"Nina Lewis", a/k/a "Diana Campbell",
a/k/a "Norma Miller",
Defendants-Appellants.
 Nos. 105, 106, Dockets 88-1347, 88-1371.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 12, 1989.
Decided Oct. 20, 1989.
 
 Kerri Martin Bartlett, New York City, Asst. U.S. Atty., S.D.N.Y. (Benito Romano, U.S. Atty. S.D.N.Y., Elliott B. Jacobson, Asst. U.S. Atty., of counsel), for appellee.
 Jonathan Lubell, New York City (Morrison, Cohen, Singer & Weinstein, of counsel), for defendant-appellant Shakur.
 Judith L. Holmes, Amherst, Mass., for defendant-appellant Buck.
 Before PRATT, MINER and ALTIMARI, Circuit Judges.
 PER CURIAM:
 
 
 1
 Mutulu Shakur and Marilyn Jean Buck appeal from judgments entered in the United States District Court for the Southern District of New York, Charles S. Haight, Jr., Judge, convicting them each of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), participation in a racketeering enterprise, bank robbery, armed bank robbery, and bank robbery murder, in violation of 18 U.S.C. Secs. 1961, 1962(d), 1962(c), 2113(a), 2113(d), 2113(e), and 2.
 
 
 2
 Shakur and Buck were participants in a group known as the "family", organized in the mid-1970s to further its conception of the Black struggle in America. Although the "family's" goals were largely political, their means of attaining those goals were violently criminal. From December 1976 to October 1981, the "family" committed a succession of robberies and attempted robberies of armored trucks in the Northeast. Shakur was one of the leaders of a small circle of men who planned and executed the robberies, while Buck was a member of the so-called "secondary team", a group consisting mostly of women who assisted in the robberies by driving get-away cars, planning escape routes, and renting "safe houses". The "family's" final and most notorious crime, the "Brinks robbery" of October 20, 1981, resulted in the shooting deaths of a Brinks guard and two police officers in Nanuet and Nyack, New York.
 
 
 3
 After eluding authorities for more than three years, Buck was arrested by FBI agents in Dobbs Ferry, New York on May 11, 1985. Following leads gathered from the Buck arrest, the FBI discovered Shakur living in Los Angeles under an assumed name. On February 11, 1986, Shakur, too, was arrested.
 
 
 4
 Shakur and Buck were tried together on consolidated indictments. After numerous pre-trial motions, hearings, orders, and appeals, including a suppression order and a bail decision that were both reversed by this court, see United States v. Buck, 813 F.2d 588 (2d Cir.), cert. denied, 484 U.S. 857, 108 S.Ct. 167, 98 L.Ed.2d 121 (1987); United States v. Shakur, 817 F.2d 189 (2d Cir.), cert. denied, 484 U.S. 840, 108 S.Ct. 128, 98 L.Ed.2d 85 (1987), trial commenced on November 9, 1987. On May 11, 1988, after seven days of deliberation, the jury returned verdicts of guilty against both defendants on all counts of the consolidated indictments.
 
 
 5
 In their joint appeal, Shakur and Buck do not contend that the evidence against them was insufficient to establish their guilt. Instead, they argue (1) that prejudicial extra-record information before the jury impermissibly tainted the verdict; (2) that the government's cross-examination of a defense witness deprived them of a fair trial; and (3) that certain items of evidence were improperly admitted at trial. After giving careful consideration to each of the defendants' arguments, we are satisfied that nothing in the record before us requires reversal.
 
 
 6
 Shakur and Buck claim that three incidents involving jurors entitle them to a new trial or, alternatively, to a remand for further investigation by the district court. The first incident came to light during trial when defense counsel informed Judge Haight that one of the jurors had discussed the case at a dinner with two other people, one of whom was related to an associate of Shakur. In an interview with Judge Haight, the juror stated that she had attended the dinner in question and had mentioned that she was a juror in the Brinks case. But the juror also indicated to her dinner companions that she could not discuss the case further. When Judge Haight asked the juror whether her dinner conversation would affect her ability to sit as an impartial juror, she said that it would not. After interviewing one of the juror's dinner companions, Judge Haight denied the defendants' application to excuse the juror for cause. Shakur and Buck do not challenge retention of the juror, but argue that the matter warrants further investigation generally to determine if the entire panel was tainted by the incident.
 
 
 7
 The other two episodes were revealed post-verdict. A defense witness, Ahmed Obafemi, told defense counsel in a "post-verdict critique" that he had been acquainted with the jury foreperson when both of them were high school students in New Rochelle, New York. The foreperson independently confirmed this acquaintance in a telephone call to the courtroom deputy shortly after the verdict. She said that she had recognized Obafemi as someone she had known in high school as Jesse Dixon, but later told the court that she had not seen him in "[p]robably over twenty years." She remembered that he "used to get in trouble", but could not recall any details.
 
 
 8
 In the same telephone conversation with the courtroom deputy, the foreperson related the other incident involving extra-record information. During trial, one of the jurors accidently ran into an excused prospective juror who told him that, during voir dire, an investigator for the defense had come to his job and questioned his fellow workers in an apparent attempt to discover the prospective juror's political views. After the trial juror related this incident in the jury room (erroneously referring to the investigator as Shakur's attorney), there was some informal discussion among the jurors about whether investigation of prospective jurors was a standard procedure in criminal trials. Some thought it was, others thought it was not.
 
 
 9
 Based on these three incidents defendants moved for a new trial or for further investigation pursuant to Fed.R.Evid. 606(b). After interviewing the jurors involved, ordering additional briefing, and hearing oral argument, Judge Haight considered each of the incidents in a detailed and thoughtful 61-page opinion, and concluded that none of the incidents warranted a new trial or further investigation. 723 F.Supp. 925 (1988). Having reviewed the extensive record developed on this issue, and Judge Haight's thoughtful treatment of the arguments presented by counsel, we are convinced that the district court conducted appropriate proceedings and reached a conclusion that is consistent with our decisions in this area. See, e.g., United States v. Ianniello, 866 F.2d 540 (2d Cir.1989); United States v. Calbas, 821 F.2d 887 (2d Cir.1987), cert. denied, 485 U.S. 937, 108 S.Ct. 1114, 99 L.Ed.2d 275 (1988); United States v. Moon, 718 F.2d 1210 (2d Cir.1983), cert. denied, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984). Therefore, without further comment, we affirm the denial of defendants' motion for a new trial or for further proceedings on the ground of jury bias for substantially the same reasons set forth in the district court's memorandum and order of July 29, 1988. 723 F.Supp. 925.
 
 
 10
 Defendants next contend that the government's cross-examination of a defense witness deprived them of a fair trial by improperly calling attention to Buck's failure to testify. As part of her defense case, Buck called a San Francisco physician who had known her in the late 1960s and early 1970s. Based on his knowledge of Buck's political views, the physician testified as to what Buck had intended to convey about the Nanuet/Nyack shootout in a document seized in her apartment. In an effort to cast doubt on the physician's ability to interpret Buck's thoughts, the government asked the witness on cross-examination: "Wouldn't it be fair to say that Ms. Buck is in the best position to say whether or not something means--what something means?" Following objection and a side-bar conference, Judge Haight ruled that the government's line of questioning was not one "that [could] be usefully put to this witness." Judge Haight later denied the defendants' motion for a mistrial on this issue, holding that although the government's question to the physician was improper, the incident was harmless beyond a reasonable doubt. At the close of the evidence, Judge Haight charged the jury as follows:
 
 
 11
 The defendants have not testified in this case. That is their absolute right, and in no respect may their election not to testify be considered by you as any evidence against them or as a basis for any inference against them. The Constitution and the laws of the United States provide that in any criminal matter the defendant is under no obligation to testify or indeed come forward with any evidence because the burden of proving a violation of law is solely and exclusively upon the prosecution. I therefore charge you that you may not consider in any way the fact that defendants have chosen not to testify in this case. That is as I have said their absolute right under the law.
 
 
 12
 * * *
 
 
 13
 * * *
 
 
 14
 If at any time any question the prosecution asked the witness seemed to suggest to you that the defendant should take the stand and explain something, you should pay no attention to the suggestion because it would be improper to suggest in any way that a defendant in a criminal case should ever take the stand to testify as to anything.
 
 
 15
 In light of Judge Haight's curative charge, and in the context of the record as a whole, we agree that any error in the government's cross-examination was harmless. The cross-examination was a small part of a lengthy trial and, as Judge Haight noted, the improper question in this context was far less likely to cause prejudice to the defendants' fair trial rights than if the government had referred to Buck's silence in its summation or rebuttal. Moreover, given the substantial and well-corroborated evidence against Buck, and the admittedly remote effect the question at issue had on Shakur, Judge Haight's denial of a mistrial was proper. Any possible lingering prejudice to defendants was certainly cured by Judge Haight's plainly worded instructions to the jury to ignore any suggestion that a defendant in a criminal trial should take the stand for any reason.
 
 
 16
 Finally, Shakur and Buck contest various evidentiary rulings of the district court. They first object to the admission of a wooden box that contained bomb-related equipment and documents describing how to make explosives. Although the "family" never had occasion to set off the explosives in carrying out any of their robberies, there was ample testimony that explosives played a part in the planning and tactics of the "family's" crimes, and were consistent with the violent aims of the group. We find no error, therefore, in the district court's determination that this evidence was relevant for the purposes for which it was admitted, and that its probative value was not substantially outweighed by unfair prejudice to defendants. Fed.R.Evid. 403.
 
 
 17
 Buck argues that the district court erred in failing to suppress evidence seized during searches of her apartments in East Orange, New Jersey and Baltimore, Maryland. As to the East Orange search, we rejected on a prior appeal Buck's claims based on the failure of the warrant adequately to particularize the items to be seized. See Buck, 813 F.2d at 592-93. Her other attacks on the legality of this search are equally untenable. Even if the issuing judge erred in determining the existence of probable cause, the officers' reliance on the warrant was objectively reasonable. See United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).
 
 
 18
 The evidence seized from Buck's Baltimore apartment was also properly admitted. Buck argues that the magistrate abandoned his neutral and detached role by spending six hours at FBI headquarters and listening to radio transmissions of a prior warrant-less bomb sweep of the apartment before he signed the warrant. The identical argument, however, was advanced by an individual arrested in Buck's apartment, and was squarely rejected by this court in United States v. Whitehorn, 829 F.2d 1225, 1233 (2d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988). Attempting to escape the coverage of our prior ruling, Buck contends that Whitehorn was decided on an incomplete record. Whatever the record in Whitehorn may have revealed about this search, we conclude that on the record now before us the magistrate did not abandon "that neutrality and detachment demanded of a judicial officer" within the meaning of Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 326, 99 S.Ct. 2319, 2324, 60 L.Ed.2d 920 (1979).
 
 
 19
 We have given careful consideration to the additional grounds for reversal advanced by Shakur and Buck, and find them all to be without merit. Accordingly, the judgments appealed from are affirmed in all respects.