UNITED STATES of America, Plaintiff,

v.

Norman GRIFFITHS, Defendant.

No. 93–CR–202A.

United States District Court,
W.D. New York.

Feb. 22, 1994.

Patrick H. Nemoyer, U.S. Atty., W.D.N.Y., James P. Kennedy, Jr., Asst. U.S. Atty., of Counsel, Buffalo, NY, for the government.

William Clauss, Asst. Federal Public Defender, Rochester, for defendant.

## DECISION AND ORDER

ARCARA, District Judge.

### BACKGROUND

Defendant, Norman Griffiths, is charged in a two count indictment with possession with intent to distribute a Schedule II controlled substance in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and 21 U.S.C. § 844(a). Defendant was arrested on July 14, 1993, at the Niagara Frontier Transportation Authority ("NFTA") bus terminal in Buffalo, New York. This matter was referred to Magistrate Judge Carol E. Heckman, pursuant to 28 U.S.C. § 636(b)(1), on July 28, 1993.

On August 18, 1993, defendant moved to suppress evidence obtained as a result of a warrantless search of his duffel bag at the NFTA police office. A suppression hearing was held before Magistrate Judge Heckman on September 28, 1993. On December 8, 1993, Magistrate Judge Heckman filed a Report and Recommendation recommending that defendant's motion to suppress evidence be granted. On December 22, 1993, the government filed objections[1] to the Report and Recommendation. Defendant filed a response to the government's objections on January 26, 1994. Argument was heard on February 1, 1994.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made.

### DISCUSSION

#### I. *Consent*

 A warrantless search conducted pursuant to a valid consent is constitutionally permissible. *Schneckloth v. Bustamonte*, 412 U.S. 218–19, 93 S.Ct. 2041–43, 36 L.Ed.2d 854 (1973). However, the government bears the burden of establishing, by a preponder-

ance of the evidence, that defendant's consent was "freely and voluntarily" given. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968); *see also United States v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974); *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir.1983), *cert. denied*, 471 U.S. 1021, 105 S.Ct. 2030, 85 L.Ed.2d 313 (1985). Whether the consent is in fact voluntary "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047. Voluntariness may not be established simply by a showing of mere acquiescence to a police officer's request. *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir.1993).

Magistrate Judge Heckman made a proposed finding that defendant did not knowingly and voluntarily consent to the warrantless search of his duffel bag. Regarding the conflict in testimony as to whether defendant consented to the search either on the street or at the NFTA police office, Magistrate Judge Heckman found that defendant's testimony was credible and worthy of belief and resolved the conflict against the government as it had the burden of proof on the issue of consent. Relying on *United States v. DeWitt*, 946 F.2d 1497, 1500 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992), Magistrate Judge Heckman made a proposed finding that the government did not meet its burden of demonstrating by a preponderance of the evidence, "with clear and positive testimony," that defendant gave an informed, knowledgeable and voluntary consent to the search. Item No. 12, at 26.

The government objects and argues that Magistrate Judge Heckman erred in her application of the totality of the circumstances test and in the standard of proof applicable to a determination of .the voluntariness of defendant's consent to a warrantless search.

---

1. The Court notes that the government seems to have personalized some of its objections. The Court finds such phrases as "magistrate wholly failed;" "magistrate inexplicably isolates;" "mercurial meaning that ... magistrate judge ascribes to the phrases ...;" "magistrate judge completely fails;" "magistrate *inexplicably whol-* *ly fails to mention;*" "magistrate judge became preoccupied with defendant's subjective state of mind;" "magistrate ... fell victim to the very trap ...;" unnecessary. The government would do better to base its position solely on factual argument and legal principles.

## II. *Inevitable Discovery*

■ The inevitable discovery doctrine provides an exception to the exclusionary rule where the government can demonstrate that the evidence would have been acquired lawfully through an independent source absent the government misconduct. *Murray v. United States*, 487 U.S. 533, 539, 108 S.Ct. 2529, 2534, 101 L.Ed.2d 472 (1988). *See also, United States v. Eng*, 971 F.2d 854, 859 (2d Cir.1992) (citing *Nix v. Williams*, 467 U.S. 431, 448–50, 104 S.Ct. 2501, 2511–12, 81 L.Ed.2d 377 (1984)). The government has the burden of proving by a preponderance of the evidence that the evidence "ultimately or inevitably" would have been discovered by lawful means. *United States v. Whitehorn*, 829 F.2d 1225, 1230 (2d Cir.1987).

Magistrate Judge Heckman made a proposed finding that the government failed to sustain its burden by a preponderance of the evidence that the controlled substance would inevitably have been discovered during an inventory search of defendant's bag incident to his detention on an uncharged violation of the immigration laws.

The government objects and argues that the evidence supports a finding that an inventory search, pursuant to defendant's detention on an immigration detainer, would have disclosed the presence of controlled substances in defendant's duffel bag and, therefore, defendant's motion to suppress evidence should be denied.

### CONCLUSION

Upon careful consideration of the Report and Recommendation and of the submissions of the parties, and after hearing oral argument, the Court adopts the proposed findings of the Report and Recommendation. The proposed findings are amply supported by the record. Magistrate Judge Heckman made specific findings of fact as to the testimony presented and provided a thorough analysis of the totality of the circumstances in this case regarding the issue of consent and the issue of inevitable discovery.

■ While the District Court is required to make a *de novo* determination of those portions of the Report and Recommendation

which have been objected to, credibility determinations by a magistrate judge, who has heard and observed the witnesses, are given deference. *United States v. Marshall*, 609 F.2d 152 (5th Cir.1980). Magistrate Judge Heckman observed first-hand the demeanor of the witnesses who testified at the hearing and based her proposed finding crediting defendant's testimony regarding the absence of consent on these observations. Accordingly, the Court finds no basis in the record for rejecting Magistrate Judge Heckman's proposed finding crediting defendant's testimony.

■ The Second Circuit has determined that the prosecution must prove, by a preponderance of the evidence, that a defendant's consent to search was "freely and voluntarily" given. *Calvente*, 722 F.2d at 1023. Although Magistrate Judge Heckman determined that the government failed to meet its burden of establishing consent by a preponderance of the evidence, "with clear and positive testimony," it is clear from the record that Magistrate Judge Heckman applied the preponderance of the evidence standard to the circumstances of this case and that the government failed to meet its burden of establishing defendant's consent to a warrantless search of his duffel bag based on that standard.

■ Accordingly, for the reasons set forth in Magistrate Judge Heckman's Report and Recommendation, and for the reasons set forth herein, the Court grants defendant's motion to suppress evidence.

IT IS ORDERED that the parties shall appear in Part II of this Court at 9:00 a.m. on March 8, 1994, for a meeting to set trial date.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

HECKMAN, United States Magistrate Judge.

This matter was referred to the undersigned by the Hon. Richard J. Arcara, to hear and report, in accordance with 28 U.S.C. § 636(b). Defendant has moved to suppress evidence obtained as a result of a

warrantless search of his luggage. A hearing was held before this court on September 28, 1993. For the following reasons, it is recommended that defendant's motion be granted.

## BACKGROUND

At the suppression hearing, the government called Niagara County Sheriff's Deputy Randy Fry and United States Border Patrol Agent Daniel Allman as witnesses, and defendant testified on his own behalf. The testimony of each witness is summarized below.

### I. *The Testimony of Deputy Fry*

Deputy Fry testified that on the morning of July 14, 1993, he was working at the bus terminal in downtown Buffalo as part of the United States Drug Enforcement Agency ("DEA") Task Force Transportation Unit. He had been assigned to that unit for approximately one year at the time of the hearing. On July 14, 1993, he was not in uniform (T. at 3–5).[1]

At approximately 7:20 a.m. Deputy Fry observed the arrival of the "express" bus from New York City.[2] He testified that defendant was the first person to get off the bus, and that defendant "looked around repeatedly" as he entered the terminal (T. at 5). According to Fry, once defendant was inside the terminal, he appeared to make eye contact with Agent Allman, who was in uniform with a holstered weapon visible and was also observing the passengers disembarking from the express bus. Defendant then turned left and walked along the glass-encased corridor toward the North Division Street exit on the south side of the terminal. Deputy Fry followed defendant outside, and observed defendant turn right on North Division and walk west down the sidewalk toward Main Street (T. at 5–8).

Fry then spoke with Agent Allman, who had come outside of the terminal to speak with another person. Fry and Allman got in Allman's marked Border Patrol car and proceeded west along North Division Street in the same direction as defendant. Fry observed defendant turn and look in the direction of the patrol car two or three times (T. at 42). The car eventually passed defendant, turned right onto Main Street, and parked approximately thirty feet past the intersection of North Division and Main. Fry then observed defendant stop on Main Street at a Metro Rail ticket machine and purchase a ticket (T. at 8–11).

Fry testified that he approached defendant at the ticket machine, and displayed his badge. He advised defendant that he was a police officer, and asked if he could talk to him. Defendant responded "yeah." Fry then asked defendant where he was coming from. Defendant responded "New York." Fry asked him where he was going, and defendant responded "Busti." Fry said, "you mean Busti Street?" Defendant responded "yes." Fry then asked him who he was going to visit, and defendant responded "Earl." Fry asked him what "Earl's" last name was. According to Fry, defendant hesitated, and then said, "I don't know, I forgot." When Fry asked defendant how long he was going to be in Buffalo, defendant responded approximately two weeks, and that he was thinking about relocating to Buffalo (T. at 11–12).

Deputy Fry then asked defendant for identification. Defendant produced a Florida license and a Social Security card from his wallet. Fry testified that he examined the identification documents for about ten or fifteen seconds, found nothing suspicious, and then returned them to defendant. Upon further questioning by Fry, defendant stated that he was still living in Florida, and had

---

1. "T. at ___" refers to pages of the transcript of the September 28, 1993 suppression hearing.

2. It is well-documented that the early morning express bus from New York City to Buffalo is frequently used by drug traffickers to transport narcotics to the Western New York area. *See, e.g., United States v. Glover,* 957 F.2d 1004, 1006 (2d Cir.1992). Indeed, Chief Judge Oakes, in his dissenting opinion in *Glover,* has suggested that an Attorney General's warning should be posted in the New York City Port Authority building, for the benefit of potential passengers who would prefer not to be interrogated or searched by D.E.A. Task Force Agents, which states: "Do not take the express bus from New York City to Buffalo!" 957 F.2d at 1015.

flown from Florida to New York City two days earlier (T. at 13–14).

After examining the identification documents, Fry advised defendant that he was a narcotics officer and was concerned with the transportation of drugs into Buffalo. Fry then asked defendant if he was carrying any drugs, to which defendant responded "no." Fry testified that he then asked defendant if he could look in the black duffle bag he was carrying, and advised defendant that he did not have to let Fry look in the bag because he was not under arrest. According to Fry, defendant said "go ahead" (T. at 14–15). Fry testified that he then reached into his "fanny pack," took out a pair of dark leather gloves, and put them on in preparation for his search of defendant's bag. No search took place at that time, however, because Agent Allman approached and began questioning defendant about his citizenship (T. at 49–60).

Fry testified that Allman had previously walked along with Fry as Fry initially approached defendant at the Metro Rail ticket machine, but that Allman had continued walking to a point about twenty or thirty feet past where Fry and defendant were standing. Upon approaching, Allman asked defendant if he was a resident or a citizen of the United States. Defendant asked, "how do you mean that?" Allman then asked defendant where he was born, and defendant replied "Jamaica." According to Fry, Allman then asked defendant if he had a permit or a green card. Defendant stated that he had a green card, but did not have it with him. Allman then told defendant that the officers were going to take him back to the Niagara Frontier Transit Authority ("NFTA") Police office at the bus terminal to check on his citizenship status. Fry testified that defendant was "placed in the back of" the border patrol car, and that he continued to carry his bag with him in the back seat. Fry testified that the officers did not conduct any type of "pat down" or other search of defendant, nor did they place him in handcuffs, touch him in any way, or display any weapons prior to placing defendant in the patrol car (T. at 15–19).

Deputy Fry testified that when Agent Allman told defendant to accompany the officers to the NFTA terminal, defendant was no longer free to leave the scene but was being administratively detained. Fry testified that he did not have probable cause to arrest defendant for any crime at that point, but that he did have reasonable suspicion that defendant was engaged in some kind of criminal activity based on the way defendant appeared to avoid contact with Agent Allman after looking in his general direction in the bus terminal, the way he looked at the patrol car while walking on North Division Street, and the way his answers to Fry's questions "wandered" (T. at 62–66).

Deputy Fry further testified that when they got in the patrol car, Agent Allman immediately called the Border Patrol office on the car radio to check on defendant's status. They proceeded to the NFTA bus terminal, which was only a couple of minutes away. When they arrived at the terminal, the officers and defendant exited the vehicle and proceeded inside to the NFTA police office. According to Fry, defendant was not restrained in any way, and still had his bag with him. They entered the office, where the only other person present was DEA Special Agent Bruce Johnson who was wearing plain clothes and was seated at a desk (T. at 19–22).

Once inside the police office, Deputy Fry again asked defendant if he could take a look in defendant's bag. However, Fry did not advise defendant while they were in the police office that defendant was free to decline Fry's request to search the bag (T. at 71–72). According to Fry, defendant said "go ahead," and placed the bag on the desk. Fry unzipped the bag and began removing its contents, placing the items on the desk. He removed items of clothing and a Minute Maid fruit juice container. He shook the juice container and placed it on the desk. According to Fry, Agent Johnson noticed that the juice container had been opened and then resealed somehow. Agent Johnson picked up the juice container, opened it, and removed a plastic bag. Inside the plastic bag were two smaller plastic bags containing chunks of a beige-colored substance which Fry recognized as crack cocaine base. Agent Johnson asked defendant "what is this?"

Defendant responded that he did not know, and that he had merely bought the juice at a store. At that point, Deputy Fry placed defendant under arrest and read him his *Miranda* rights. The substance in the bags was subsequently tested and found to consist of approximately fifty-six grams of cocaine base. The entire encounter, from the arrival of the express bus to the arrest of defendant, lasted less than thirty minutes (T. at 22–27).

After defendant was placed under arrest, but while defendant was still present in the NFTA police office, Agent Allman received information over the telephone that defendant was a legal resident alien (T. at 73–75). The initial information received by Agent Allman indicated that defendant had previously been arrested in New York City on a weapons charge, and an immigration detainer was placed on defendant. However, it was subsequently determined on approximately July 19, 1993, after Allman had conducted a fingerprint check, that it was not defendant but another individual with the same name who had been arrested on the weapons charge, and the detainer was lifted (T. at 75–76; 114–15).

## II. *The Testimony of Border Patrol Agent Allman*

Agent Allman testified that he was standing directly in front of defendant as he entered the terminal through Gate Number 8. Defendant looked at Allman and turned and walked through the North Division Street exit. Allman then observed Deputy Fry, who appeared to follow defendant through the exit. He then followed defendant and Fry outside, where he encountered another individual and questioned him about his citizenship. He then spoke to Fry, who indicated that he was interested in talking to defendant (T. at 82–84).

Allman further testified that he approached Fry and defendant on Main Street after he observed them talking for approximately a minute. As he approached, he noticed that defendant was speaking with a West Indies accent, but did not recall hearing the substance of the conversation between Fry and defendant. Allman introduced himself as an Immigration officer with the United States Border Patrol, and asked defendant if he was a citizen or resident of the United States. When defendant asked "how do you mean that?", Allman asked defendant where he was born. Defendant replied that he was born in Jamaica. Allman asked him if he had a passport or an alien registration card. Defendant responded that he had a green card, but had left it home. Allman then told defendant that he wanted him to accompany him back to the office in the bus terminal where he could check on his immigration status (T. at 91–94).

Allman testified that defendant and the two officers walked over to the patrol car, and that defendant got in the back seat and Fry got in the front passenger's seat. Allman got in the driver's seat and immediately called his office on the car radio and requested a record check through the Immigration computer, based on the identification given to him by defendant (T. at 95–96).

Allman testified that based on his training, experience and familiarity with the immigration laws, resident aliens are required to carry their green cards and could be subject to a fine or imprisonment for failure to do so. He stated that he had detained people on numerous occasions for the purpose of determining their immigration status, and that it this was the reason he detained defendant (T. at 102–04).

According to Allman, after they entered the NFTA office, defendant sat down at the desk, which takes up most of the room in the office. Allman could not recall if Agent Johnson was present in the office when they arrived, or if Johnson came in a short while after they arrived. In any event, Allman testified that the three officers and defendant were the only persons present during the entire time, and that only he had a visibly displayed weapon. Allman stated that he immediately used the telephone to call his office in order to determine if any response had been made to his radio request for an immigration computer search. He also testified that, although he was still on the telephone at the time, he heard Deputy Fry ask defendant for permission to search his bag, and he heard defendant consent to the search (T. at 104–06).

Agent Allman also testified that it was routine procedure for the Border Patrol to conduct an inventory search of the personal effects of persons held in custody subject to an immigration detainer (T. 119–20).

Agent Allman testified that although he routinely detains persons in order to determine their resident alien or immigration status, to his knowledge such persons are not regularly prosecuted for violation of the immigration laws based on their failure to produce a green card. Allman further testified that when defendant did not produce a green card, Allman did not give defendant the option of going with him back to the police office at the bus terminal, but simply told defendant that he was going to do so. According to Allman, at that point defendant was no longer free to leave (T. 128–31).

### III. *The Testimony of the Defendant*

Defendant testified that when the bus arrived at the Buffalo terminal, he helped a young woman with her luggage as she got off the bus before him, and that he opened the doors to the terminal for her. As he entered the terminal after the woman, he observed Agent Allman in his green Border Patrol uniform standing directly in front of him, at a distance. Defendant testified that he had been to the Buffalo bus terminal approximately twice before, and knew where the exit was. He proceeded to the exit, and turned right toward Main Street. As he crossed the second of two intersections between the terminal and Main Street, he noticed the Border Patrol car driving alongside him on North Division Street. The patrol car pulled into a "buses only" lane near the corner of North Division and Main. As he reached Main Street, defendant proceeded to a ticket machine directly in front of him to buy a ticket for the Metro Rail. As he approached the ticket machine, he saw the bus pull out from the "buses only" lane, and the Border Patrol car pull out behind the bus. He observed the patrol car turn right on Main Street and pull onto the Metro Rail tracks. According to defendant, the patrol car stopped directly in front of the ticket machine, and Deputy Fry and Agent Allman got out (T. at 146–52).

Defendant testified that both Fry and Allman approached him and stood approximately three feet from him during the entire encounter. Defendant observed Allman's holstered weapon. Fry identified himself as a DEA agent, and asked defendant where he was going. Defendant responded that he was going to Busti Avenue or Street. Fry then asked him for identification, and defendant produced his Florida license. According to defendant, Fry looked at the license and continued to hold it while he "asked" defendant if he could look in his bag. The defendant testified:

> Then he said to me—he didn't so much ask me to look in my luggage although the words he used were words that he would equate with a question, but the tone of voice and the manner in which he used his words were as if he is going to search it anyway.

(T. at 155). Defendant also stated that Fry never told him that he could refuse the request to search the bag (T. at 159). Defendant testified that he did not give Fry permission to search his bag (T. at 156–57).

Defendant testified that at that point, Deputy Fry unzipped the pouch around his waist and took out a pair of black gloves. Fry put the gloves on and bent over to reach for defendant's bag, which he had been carrying on his shoulder but which had slipped to the ground between defendant and Fry. Defendant testified that just as Fry was bending toward the bag, Agent Allman asked defendant where he was from. Defendant responded by asking Allman what he meant, and Allman asked him where he was born. Defendant responded that he was born in Jamaica. According to defendant, Fry and Allman then looked at each other, did not exchange any words, and Fry picked up defendant's bag while both officers gestured and "shooed" the defendant into the patrol car. Defendant proceeded with them to the patrol car and got into the back seat. Defendant testified that neither agent ever asked for permission to pick up his bag, nor did they advise him of his constitutional rights at this time (T. 156–59). He felt he had no choice but to submit to their wishes:

A. Right. Right. They kind of—they both were on either side of me at this point, and they—they like put their hand behind me, did not touch me, but they put their hand behind me and kind of gestured towards the car, and they started to walk and I walked with them. The manner they did it was if I—if I had not walked with them they would have eventually put me in the car regardless because that's—you've got to—you've got to understand that the way they approached me, especially Fry himself, was regardless of whatever I said. That is my understanding, the way he came across to me, regardless of whatever I did he was going to do what he wanted to do anyway.

(T. at 158).

According to defendant, once he was in the back seat of the car, Allman asked him if he had a Social Security card, which he took out of his wallet and passed through the mesh partition between the front and back seats. He stated that the officers still had his driver's license. He further testified that the officers never told him where they were taking him, but that he recognized the bus terminal when the car stopped there. Allman opened the back door and defendant got out and was directed into the terminal. Fry followed, carrying defendant's bag. They entered the office, where defendant observed a total of three DEA agents (including Fry and Johnson), two Border Patrol agents (including Allman), and a uniformed police officer. According to defendant, the two Border Patrol agents and the police officer displayed holstered weapons (T. at 162–63).

Defendant testified that he was directed to sit in a chair at the desk and that Fry immediately placed defendant's bag on the desk and began to go through it, without asking for defendant's permission or advising him that he did not have to consent to the search. Defendant observed Fry taking items out of the bag, feeling them, and placing them on the table. Defendant testified that he did not voluntarily consent to allow any of the officers to search his bag, did not feel at any time that he had a choice in the matter, and did not sign any written consent forms allowing the search (T. at 164–68).

On cross-examination, defendant testified that upon entering the terminal he did not turn left toward the North Division Street exit when he saw the uniformed Border Patrol agent, but was already headed in that direction (T. at 182–84). He also testified that he was planning to take the Metro Rail to have breakfast at a restaurant that he had visited before on Fillmore Avenue, before he proceeded to Earl's house on Busti (T. at 191–92). He further testified that he was not asked any questions about how he got to New York from Florida or how long he was planning to stay in Buffalo until after he was arrested and was being processed at the Federal Building (T. at 196–97).

With regard to whether he consented to the search of his bag on the street before he was taken back to the NFTA terminal, defendant testified that Deputy Fry made a statement to him about looking in his bag. The testimony on cross examination was as follows:

A. He did not so much as ask me, but made a statement.

Q. Well, what kind of a statement did he make?

A. He said—the words he used were, if I can remember clearly, could he look in my bag or could he search my bag, but the tone of voice and the mannerism in which he used it was not of a question, it was more of a statement.

Q. Well, could you tell me—could you give me an example of the tone of voice that he said, could I look in your bag, that you thought was a statement?

A. Let me see. It would be something as if you would say, do you mind if I look in your bag.

Q. Okay. But that to you is not asking you a question?

A. It's just like—it's just as if you would ask me a question and I could say, what, or I could say, what. Same word, different meaning. That's how it came across to me.

Q. But the point is the words that he actually said were, could I look in your bag?

A. Right, those words if you wrote them down would have a question mark behind it, but the way it came across to me was more of a statement.

(T. at 198–99.) Defendant further testified that he never said "go ahead"—he merely dropped his shoulder and let the bag fall to the ground. Defendant also testified that Fry never told him that he could refuse to consent to the search (T. at 200–01). Finally, defendant testified that when they got in the patrol car, Deputy Fry placed defendant's bag in the front seat with the officers while defendant rode in the back (T. at 206–07).

## DISCUSSION

Defendant now moves to suppress the evidence seized as a result of Deputy Fry's search of the bag and Agent Johnson's search of the juice container. According to defendant, once the encounter on Main Street blossomed into a custodial situation, his detention was justifiable only if the officers had probable cause to arrest defendant, which they did not. Defendant also contends that the government has not met its burden of demonstrating that the defendant consented to a search of his bag.

The government argues that the initial encounter on the street was consensual, and that the custodial transportation to and detention of defendant at the NFTA police office was justifiable based on the officers' reasonable suspicion and/or probable cause to believe that defendant was in violation of immigration laws requiring him to carry his green card. The government also contends that the hearing record clearly establishes that the defendant voluntarily consented to the search of his bag. Finally the government argues that even if the search was illegal, the drugs should not be suppressed because they would have been inevitably discovered in an inventory search incident to defendant's detention on an immigration detainer.

## I. The Encounter Between the Officers and Defendant.

It is not seriously contended by defendant that his initial encounter with Deputy Fry at the ticket machine on Main Street amounted to a "seizure" protected by the fourth amendment. Indeed, police may initiate contact with an individual on the street, without any objective level of suspicion and without implicating the protections of the fourth amendment, in order to ask general questions, examine identification documents, or request consent to search his or her luggage, "as long as the police do not convey a message that compliance with their requests is required." *Florida v. Bostick*, 501 U.S. 429, ——, 111 S.Ct. 2382, 2386–87, 115 L.Ed.2d 389, 398–99 (1991). In order to determine whether police have conveyed that message, or whether any particular encounter constitutes a "seizure" for the purposes of the fourth amendment, the court must consider all of the circumstances surrounding the encounter "to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id.*, 501 U.S. at ——, 111 S.Ct. at 2389, 115 L.Ed.2d at 402; *see also United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir.1992).

The circumstances in this case indicate that the initial encounter between defendant and Fry was consensual. It took place on a pedestrian thoroughfare in a conspicuously public area in downtown Buffalo, during a fairly busy time of day. It is clear that Deputy Fry initiated the encounter, although the testimony at the hearing tended to show that defendant was aware of Agent Allman's presence from the onset. Fry immediately identified himself as a drug enforcement officer, displayed his badge, explained the purpose of the encounter, and obtained defendant's express consent to limited questioning. At no time did Fry display his weapon, physically touch defendant, use threatening language or engage in any other conduct indicating that compliance with his request was compulsory. Fry properly questioned defen-

dant about his identification, the purpose of his visit to Buffalo and his destination.

However, the initial encounter took on a markedly different character at a crucial stage. Just as defendant was being "asked" to consent to a search of his duffle bag, and before any search took place, Agent Allman stepped in and began questioning defendant about his citizenship. It was quickly determined that defendant was not a citizen of the United States and could not produce his green card to confirm his resident alien status. He was then "placed" in the patrol car and transported to the NFTA police office, admittedly at that point in police custody.

Thus, at a point immediately after Allman began questioning defendant about his citizenship, the initial consensual encounter with Fry was swiftly transformed into an investigative detention, requiring "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot ...,'" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)). As the government concedes, once defendant was unable to produce his green card, he was not free to leave. Accordingly, under the circumstances of this case, defendant and his duffle bag were "seized" at that point. *See Glover, supra*, 957 F.2d at 1009.

Thus, the equivocal and inconsistent hearing testimony as to whether the officers asked defendant to accompany them to the NFTA police office or somehow ushered him into the patrol car without saying anything, whether Fry picked up defendant's bag and placed it in the front seat or simply allowed defendant to carry his bag with him in the back seat, or whether Fry gave defendant his license back or retained it, does not present factual issues material to the court's determination as to whether the officers' conduct amounted to an unreasonable "seizure" under the fourth amendment. The inquiry at this stage is focused on whether the officers had reasonable suspicion to justify transporting defendant and his bag to the NFTA police office, and whether the officers' conduct during the detention was reasonably related to the circumstances that justified the stop in

the first instance. *Terry, supra*, 392 U.S. at 20, 88 S.Ct. at 1879; *see also United States v. Sharpe*, 470 U.S. 675, 685–86, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985); *United States v. Hooper*, 935 F.2d 484, 493 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991).

The hearing testimony establishes that, upon defendant's failure to produce proper alien registration documents, the officers had a reasonable suspicion based on specific and articulable facts that defendant was in violation of the immigration laws. *See United States v. Reyes*, 1992 WL 170885, *6 (W.D.N.Y.1992) (Skretny, J.), *aff'd*, 999 F.2d 536 (2d Cir.1993). Moreover, the circumstances indicate that, at least at this stage of the encounter, the officers "pursued [their] investigation in a reasonable and diligent manner ..." in order to confirm their suspicion. *United States v. Sharpe, supra*, 470 U.S. at 687, 105 S.Ct. at 1576. The record does not indicate that any undue force or compulsion was used in "placing" defendant in the patrol car. As soon as they were all inside the car, Agent Allman radioed his office to initiate a computer records check on defendant's immigration status.

Defendant argues that the entire confirmation process could have been accomplished over the radio, without the need to transport him to the police office. However, the fact that the officers' objectives might have been accomplished by some less intrusive means does not, by itself, render the investigative detention unreasonable: "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *United States v. Sharpe, supra* at 687, 105 S.Ct. at 1576; *see also, Cady v. Dombrowski*, 413 U.S. 433, 447, 93 S.Ct. 2523, 2530, 37 L.Ed.2d 706 (1973).

Given the proximity of the NFTA terminal, the officers acted reasonably in transporting defendant there in order to follow up on the computer records check in a less public environment. Once they arrived at the police office, Agent Allman placed a telephone call immediately in an attempt to confirm defendant's immigration status as soon as possible. Again, I do not find the factual dispute re-

garding the number of officers or agents present in the office when Allman and Fry arrived with defendant to be of consequence to the court's determination of the issues at this stage, since defendant's resident alien status was confirmed within minutes of their arrival.

Accordingly, the record sufficiently establishes that the initial encounter on the street was consensual, and that the investigative detention of defendant was warranted by the officers' reasonable suspicion that defendant was in violation of the immigration laws. Further, the actions taken by the officers to confirm or dispel that suspicion, up to the point at which Deputy Fry began to search defendant's duffle bag, were not unreasonable under the circumstances. I therefore find that the encounter between the officers and defendant did not violate defendant's fourth amendment rights so as to require suppression of the evidence found as a result of the search.

The crucial issue in this case, as revealed by the hearing testimony and the pleadings, is whether the warrantless search of defendant's duffle bag was justified by defendant's knowing and voluntary consent. It is to this issue that the court now turns.

## II. Consent.

█ It is not disputed that a warrantless search conducted pursuant to a valid consent is constitutionally permissible, *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). The government has the burden of establishing by a preponderance of the evidence, "with clear and positive testimony," *United States v. DeWitt,* 946 F.2d 1497, 1500 (10th Cir.1991), *cert. denied sub nom. Rison v. United States,* — U.S. ——, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992), that the defendant's consent was "freely and voluntarily given." *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968); *see also United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980); *United States v. Matlock,* 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974). The dispute in this case is twofold: (1) whether defendant ever actually consent-

ed, either in words or actions, to Deputy Fry's search of his bag, and (2) if he did consent, whether the consent was voluntary.

As to whether defendant consented to the search, either on the street or at the NFTA police office, the testimony is in direct conflict. Fry testified that when he asked defendant if he could look into his bag during the initial encounter on the street, he also advised defendant that he did not have to consent to the search, and the defendant said, "go ahead" (T. 14–15). Agent Allman testified that he did not hear the conversation on this point. The defendant testified that Fry "asked" to look into his bag, but that his tone of voice and manner indicated that he had no choice, and furthermore that he never stated "go ahead" or other words indicating permission to search.

After hearing the witnesses and assessing their credibility during the hearing, I find that the defendant's testimony was credible and worthy of belief. The defendant was articulate, intelligent and very detailed in his recollection of the events. He at one point demonstrated, through the use of different inflections, how the same words could be used to pose a genuine question or to state a command. The conflict in testimony must be resolved against the government, since it had the burden of proof.

There is a similar conflict on the issue of whether defendant consented to a search at the NFTA police office. Fry testified that he asked for permission to search, and the defendant again stated, "go ahead." The defendant testified that Fry placed the bag on the desk and began searching without asking.

Again, I find that the conflict must be resolved against the government. Furthermore, any consent the defendant may have given on the street would not necessarily carry over to establish consent under the more custodial conditions of the NFTA police office. *U.S. v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). Accordingly, the government has not proven consent to search.

But even if the defendant had consented to the search, the government must prove that, under the totality of circumstances, the de-

fendant's consent was voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

Voluntariness may not be established simply by a showing of mere acquiescence to a police officer's request. *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir.1993). Consent may be inferred from an individual's gestures or conduct, as well as his or her words. *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied*, 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981).

There is nothing about defendant's age (27), intelligence, or education that would indicate lack of capacity to give consent, and there is no evidence that defendant's capacity was in any way diminished by drugs or alcohol. The record is clear that upon reaching the police office, plaintiff was not again asked whether he understood that he could refuse the officer's request to look through his bag, nor was he advised of his *Miranda* rights prior to the search. While not of "controlling significance," lack of a clear showing that defendant knew he could withhold consent is a factor to be considered in the voluntariness determination. *Watson, supra; United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir.1990).

Furthermore, the search of the bag proceeded while Allman was still on the telephone attempting to confirm defendant's immigration status. The scope of the search was therefore not limited to the actual purpose of the detention—i.e., a determination of defendant's immigration status. There is no doubt that Deputy Fry was conducting the search on the basis of what he believed to be consent given by defendant after being informed that Fry was investigating drug trafficking, and there is no doubt that the officers were looking for drugs. The government has failed to offer any explanation, through hearing testimony or otherwise, why the officers could not have waited another minute or so while Allman obtained defendant's immigration status information. The officers could then have clearly and carefully informed defendant about his right to refuse to allow them to search his bag, and could

have attempted to obtain his consent under the circumstances of his investigative detention rather than relying on the vague circumstances surrounding the consent allegedly obtained during the initial encounter on the street.

Further, the Pretrial Services Report submitted by the Department of Probation indicates that defendant had no prior criminal record, and thus had no special knowledge or awareness of the protections afforded to suspected criminals by this country's legal system. *Watson, supra*, 423 U.S. at 424–25, 96 S.Ct. at 828. There is no indication in the record that defendant knew anything about the scope of his right to legal representation, the ability of the government to use the fruits of the search against him, or any other constitutional or procedural protection.

With regard to the other factors relevant to the voluntariness determination, the record is clear that defendant was not detained and questioned for a long time, was not threatened, physically intimidated, or punished by the police, did not rely upon promises or misrepresentations made by the police, and did not object while the search occurred. However, as discussed above, defendant was in custody under investigative detention when the search was conducted. He was being detained in a secluded place, in the presence of no less than three and as many as six law enforcement officers, at least one of which carried a prominently displayed weapon.

Based on the record before the court, therefore, and after considering all of the circumstances surrounding the search of defendant's bag, I find that the government has not met its burden of demonstrating with clear and positive testimony that defendant gave an informed, knowledgeable and voluntary consent to the search.

**III. Inevitable Discovery.**

■ Finally, the government argues that the search should be upheld because the drugs would have inevitably been discovered in an inventory search conducted incident to defendant's detention on an immigration detainer. I find that the government has like-

wise failed to sustain its burden of establishing inevitable discovery by a preponderance of the evidence. *See, e.g., United States v. Whitehorn,* 829 F.2d 1225, 1230 (2d Cir.1987), *cert. denied,* 487 U.S. 1237, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988).

The inevitable discovery doctrine provides an exception to the exclusionary rule where the government can demonstrate that the evidence would have been acquired lawfully through an independent source absent the government misconduct. *Murray v. United States,* 487 U.S. 533, 539, 108 S.Ct. 2529, 2534, 101 L.Ed.2d 472 (1988). As stated by the Second Circuit:

> [T]he facts of cases applying the inevitable discovery doctrine suggest that proof of inevitability is made more convincing when the areas of the search or investigation are well-defined, the government effort is planned and methodical, and a direct causal relationship and reasonably close temporal relationship exist between what was known and what had occurred prior to the government misconduct and the allegedly inevitable discovery of the evidence.

*United States v. Eng,* 971 F.2d 854, 859 (2d Cir.1992) (citing *Nix v. Williams,* 467 U.S. 431, 448–50, 104 S.Ct. 2501, 2511–12, 81 L.Ed.2d 377 (1984); *Whitehorn, supra,* 829 F.2d at 1231; *United States v. Pimentel,* 810 F.2d 366, 367–69 (2d Cir.1987)).

The government claims that, had the officers not found the drugs in defendant's bag, defendant would have been detained until such time as his citizenship and identity had been determined, and that an inventory search would have been conducted pursuant to that detention. However, the government has failed to show how an inventory search of defendant's bag would have inevitably permitted the officers to open the juice container in search of identification documents or other items to confirm or dispel that belief. Furthermore, the government's contention is not supported by concrete, non-speculative testimony. Rather, it appears to be inserted as an afterthought and was not sufficiently developed at the hearing.

Finally, no immigration law violation was ever charged, and no order to show cause for a deportation hearing was ever served on defendant. While these particular circumstances are not conclusive, they are relevant factors to be considered as part of the overall picture.

Accordingly, the court finds that defendant has failed to establish by a preponderance of the evidence that the drugs located in the juice container would inevitably have been discovered during an inventory search of defendant's bag incident to his detention on an uncharged violation of the immigration laws.

## CONCLUSION

For the reasons set forth above, it is recommended that defendant's motion to suppress the evidence obtained as a result of the search of his bag be granted.